# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SERGE HAITAYAN, et al., <br> Plaintiffs, <br><br> v. <br><br> 7-ELEVEN, INC, <br> Defendant. | CV 17-7454 DSF (ASx) <br> CV 18-5465 DSF (ASx) <br><br> Findings of Fact and Conclusions <br> of Law After Court Trial |

This matter was tried to the Court on March 23 and March 24, 2021.  Having heard and reviewed the evidence and having considered the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A.    7-Eleven

7-Eleven is the world's largest franchisor of retail convenience stores.  Dkt.[1] 323 (Douglas Rosencrans Declaration in Lieu of Live Direct Testimony [Rosencrans Decl.]) ¶ 2.  At the end of 2019, it had 8,084 7-Eleven stores operating in the United States, approximately 1,735 of which were franchises in California.  Id.

7-Eleven runs a Store Support Center with hundreds of employees who work in human resources, merchandising, legal, marketing, operations, accounting, finance, franchising, logistics,

---

[1] Unless otherwise specified, docket citations refer to the docket in Case No. CV 17-7454 DSF (ASx).

innovation, development, real estate, fuel operations, information technology, and more.  Trial Exhibit (Ex.) 1023 at 34-35.  The Store Support Center is located in Dallas, Texas.  Dkt. 324 (Arron Yount Declaration in Lieu of Live Direct Testimony [Yount Decl.]) ¶ 7.

Approximately 10% of 7-Eleven stores are non-franchised "corporate stores."  Ex. 252 at 59-64.  In California, corporate-owned stores typically make up between 1% and 2.5% of the total number of 7-Eleven locations.  Yount Decl. ¶ 19.  Corporate stores are run by store managers who are employees of 7-Eleven.  Id. ¶ 24; Trial Transcript (Trial Tr.) (Yount) at 447:24-448:5.  The store managers receive the same training as franchisees, place orders for products through the same purchasing system used by franchisees, and receive emails from 7-Eleven about store operations and promotions as franchisees do.  Trial Tr. (Yount) at 451:12-21 452:3-22, 454:14-455:9.

## B.   Plaintiffs

Plaintiffs are four 7-Eleven franchisees.  Each was or has been a franchisee for at least two decades.

Serge Haitayan first entered into a franchise agreement with 7-Eleven in 1990.  Dkt. 333 (Serge Haitayan Declaration in Lieu of Live Direct Testimony [Haitayan Decl.]) ¶ 3.  He was a franchisee through 2020 at a store in Fresno, California.  Id.  As of 2020, Haitayan is no longer a franchisee.  Id. ¶ 59.  He operates a convenience store in the same location as his former franchise.  Id.; Trial Tr. (Haitayan) at 224:9-19.

Robert Elkins bought his first 7-Eleven franchise in 1988 and his second in 1996.  Dkt. 300-1 (Final Pretrial Conference Order) ¶ 6(f).  In September 2020, Elkins sold his Lakeside, California store, the first franchise he acquired, to another franchisee for $350,000.  Dkt. 331 (Robert Elkins Declaration in Lieu of Live Direct Testimony [Elkins Decl.]) ¶ 4; Trial Tr. (Elkins) at 321:19-322:11.  He currently runs one store in El Cajon, California.  Elkins Decl. ¶ 6.

Jaspreet Dhillon bought his first 7-Eleven franchise in 1988 and his second in 2001.  Final Pretrial Conference Order ¶ 6(g).  In 2004, he transferred the first franchise he purchased to his brother.  Id.  He currently owns one store in Reseda, California.  Dkt. 332 (Jaspreet Dhillon Declaration in Lieu of Live Direct Testimony [Dhillon Decl.]) ¶ 7.

Paul Lobana has been a franchisee since 1998.  Dkt. 334 (Maninder "Paul" Lobana Declaration in Lieu of Live Direct Testimony [Lobana Decl.]) ¶ 3.  He owns two franchises individually, in Simi Valley, California, and Oxnard, California, and one with his brother. Id.  He is not seeking damages for the store he owns with his brother. Trial Tr. (Lobana) at 293:17-294:9.  He would like to own a fourth franchise.  Id. at 268:23-269:1.

## C.  Acquirement, Renewal, and Termination of Franchisees

In order to become franchisees, Plaintiffs were required to sign franchise agreements for each of their stores.  Rosencrans Decl. ¶ 5; Dhillon Decl. ¶¶ 7-8; Haitayan Decl. ¶ 3; Lobana Decl. ¶ 4; Elkins Decl. ¶ 6.  Under the agreements, 7-Eleven usually leases property and equipment to a franchisee, although some franchisees, like Haitayan, own the property on which their store is located.  Rosencrans Decl. ¶ 7. Most franchise agreements are for a fifteen-year term with the option to renew at the end of the term.  Rosencrans Decl. ¶ 5; Ex. 1387 at 204-205.  7-Eleven can choose not to renew a franchise agreement if it determines that store operations are not "meeting the requirements of the 7-Eleven System and otherwise operating in a manner consistent with the 7-Eleven Image and standards."  Ex. 1387 at 205.  Plaintiffs can choose not to renew for any reason.  Id. at 204.

Dhillon signed the first franchise agreement for his Reseda store in 2001 and renewed it in 2009.  Dhillon Decl. ¶¶ 7-8.  Haitayan signed his first franchise agreement in 1990 and renewed it in 2004 and 2019. Haitayan Decl. ¶ 3.  Lobana signed his first franchise agreement for the Simi Valley store in 1998 and renewed it in 2004 and 2019.  Lobana Decl. ¶ 4.  He signed his franchise agreement for the Oxnard store in

3

2002 and renewed it in 2008 and 2010.  Id.  Elkins signed his franchise agreement for his El Cajon store in 1996 and renewed it in 2004 and 2018.  Elkins Decl. ¶ 6.  He first signed the franchise agreement for the Lakeside store in 1988 and renewed it in 2004.  Id. ¶ 4.

Arron Yount, 7-Eleven's Director of Franchising, could think of only two terms in the franchise agreement that were negotiable: (1) the franchise fee and (2) the requirement to operate the store 24 hours a day.  Trial Tr. (Yount) at 449:19-450:16.

In order to acquire a franchise, Plaintiffs were required to pay a franchise fee to 7-Eleven in addition to any purchase price they paid to the former franchisee.  See Yount Decl. ¶ 28.  Dhillon paid an $80,000 franchise fee for the Reseda store.  Dhillon Decl. ¶ 8.  Haitayan paid $40,000.  Haitayan Decl. ¶ 4.  Lobana paid around $90,000 for each of his stores.  Lobana Decl. ¶ 4.  Elkins paid $75,000 for the Lakeside store and $27,000 for the El Cajon store.  Elkins Decl. ¶¶ 5, 7.

Franchisees pay 7-Eleven certain fees, including the "7-Eleven Charge," which is approximately 50% of the gross profits of the store.  Dkt. 326 (Davina Stevens Declaration in Lieu of Live Direct Testimony [Stevens Decl.]) ¶¶ 8, 10.  A franchisee must maintain a minimum net worth set forth in the franchise agreement, but is entitled to all of the gross profit of the business over that after paying the 7-Eleven Charge and the store operating expenses.  Id. ¶¶ 26-27.  The required minimum net worth is generally between $9,800 and $11,000.  Yount Decl. ¶ 22.  Franchisees may take "draws" from their store profits on any schedule they choose.  Id.; Stevens Decl. ¶ 27; see also Trial Tr. (Elkins) at 334:11-335:16.

Each Plaintiff agreed, in the franchise agreement he signed, to comply with all applicable laws and regulations and to hold himself out to the public as an independent contractor, to control the operation of the store, and to control labor relations in the Store.  Ex. 220 ¶ 2; Rosencrans Decl. ¶ 10.

The franchise agreement permits 7-Eleven to terminate franchisees if they commit a material breach of the agreement, which

includes about 30 grounds requiring different notice periods, such as not operating the store for the agreed number of hours, not properly maintaining the store, vacating or abandoning the store, and failing to comply with food standards.  Ex. 220 ¶ 26(a).  For most of these breaches, the franchisee has a right to cure.  Id.  Franchisees have an opportunity to cure a fourth material breach unless they have received three previous notices of material breach within the preceding two years.  Id. ¶ 26(b).  In that situation, 7-Eleven may terminate the agreement.  Id.  For a more minor violation, the field consultant may issue a "letter of notification"[2] to the franchisee, which gives the franchisee a set amount of time to cure.  Dhillon Decl. ¶ 49; Elkins Decl. ¶ 23; Trial Tr. (Rosencrans) at 462:8-463:1; Ex. 272.  Franchisees have the right to terminate their relationship with 7-Eleven without cause on 72 hours' notice.  Rosencrans Decl. ¶ 5.

Franchisees may assign their interest in their franchises to others.  See Ex. 220 ¶ 25(b).  Franchisees can sell their stores before the expiration of their franchise agreement if 7-Eleven approves the buyer.  Id.; Trial Tr. (Dhillon) at 142:6-25.  Dhillon, Haitayan, and Elkins all purchased franchises from other franchisees.  Dhillon Decl. ¶ 8; Haitayan Decl. ¶ 4; Rosencrans Decl. ¶ 4; Ex. 229; Trial Tr. (Elkins) at 350:20-22.  Elkins negotiated a non-compete agreement with the franchisee who sold Elkins his franchise.  Id. at 350:23-351:10.

7-Eleven does not require that potential franchisees have "prior knowledge of working in retail."  Dhillon Decl. ¶ 23; Haitayan Decl. ¶ 5; Lobana Decl. ¶ 14; Elkins Decl. ¶ 20; Trial Tr. (Rosencrans) at 479:24-480:2.  But everyone who purchases a 7-Eleven franchise must participate in initial training, which consists of a three-day orientation, and a multi-week in-store training.  Yount Decl. ¶ 7.

---

[2] This is alternatively referred to by Plaintiffs as a "letter of notice."  See, e.g., Lobana Decl. ¶ 18.

### D.    Plaintiffs' Beliefs About Their Role

In their trial declarations, each Plaintiff suggests in verbatim language that he came to believe he was an employee (store manager) of 7-Eleven.  Dhillon Decl. ¶¶ 10-11; see also Trial Tr. (Dhillon) at 52:21-23; Haitayan Decl. ¶¶ 7-8; see also Trial Tr. (Haitayan) at 233:8-15; Lobana Decl. ¶¶ 5-6; Elkins Decl. ¶¶ 9-10; see also Trial Tr. (Elkins) at 400:7-16.  But no Plaintiff states precisely when or why he reached this conclusion.  Each describes in his declaration, again nearly verbatim, some of requirements 7-Eleven allegedly imposes and services it provides.  They describe these as mandatory or suggest that they are.  As discussed elsewhere in this order, however, the evidence - including Plaintiffs' admissions - establishes that is generally not true.

In February 2016, Haitayan wrote an email to fellow franchisees in which he reminded them "that we are independent contractors" with the right to control product prices.  Ex. 204 ("I want to remind everyone that we are independent contractors, we have the right to custom our retail the way we want, without any pressure from any FC [field consultant] or SEI personnel.  Please advise your FC that it is not their place to push back and know your rights.").  Haitayan testified that as of that date, he considered himself an independent contractor.  Trial Tr. (Haitayan) at 175:8-11.  Haitayan was impeached at trial with his deposition, in which he had provided some explanation as to what changed his mind.  At trial he admitted that all of those events occurred substantially before 2016.  In approximately December 2020, Haitayan complained publicly about the termination of his franchise[3] stating: "I am not a store manager employed on an at-will basis."  Trial Tr. (Haitayan) 184:13-185:1; Ex. 203.

Plaintiffs admitted they identified themselves as business owners, not employees, on their tax returns, and that they were being truthful in doing so.  Id. (Dhillon) at 92:1-4, (Haitayan) at 210:5-19,

---

[3] Haitayan and 7-Eleven were unable to agree on a new lease term for the property – which was owned by Haitayan.  Trial Tr. (Haitayan) at 222:19-223:24.

(Lobana) at 287:2-288:8, (Elkins) at 344:8-346:7.  They stipulated that they continued to do so even after this lawsuit was filed.  Trial Tr. 92:23-93:2.

Each Plaintiff also declared, again verbatim, that he "was constantly under the threat that [his] store would be taken away if he did not follow 7-Eleven's rules."  Dhillon Decl. ¶ 10; Haitayan Decl. ¶ 7; Lobana Decl. ¶ 5; Elkins Decl. ¶ 9.

The Court evaluated the testimony of all witnesses pursuant to instruction 1.14 of the Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit.  The Court is not persuaded that Plaintiffs now believe they are employees.[4]  And the evidence of their conduct as franchisees belies their alleged concerns about termination.

## E.   7-Eleven's Control Over Plaintiffs' Work

### 1.   Operations Manual

7-Eleven provides to all franchisees an approximately 900-page Operations Manual that contains standards and procedures for running a 7-Eleven store.  Dhillon Decl. ¶ 24; Haitayan Decl. ¶ 6; Lobana Decl. ¶ 15; Elkins Decl. ¶ 21; Ex. 1026.  Although Dhillon, Lobana, and Elkins testified that "[f]ranchisees are required to know and use the contents of the manual," Dhillon Decl. ¶ 24; Lobana Decl. ¶ 15; Elkins Decl. ¶ 21, that is not accurate.  With limited exceptions, such as those related to food safety, franchisees are not required to comply with the suggestions set forth in the manual.  Rosencrans Decl. ¶ 31; Ex. 1026

---

[4] In addition to considering the reasonableness of the testimony, the manner of the witnesses while testifying, and all the other evidence, with regard to bias and interest in the outcome of the case, the Court notes that Haitayan claims he is owed $2,091,763.66, Dhillon claims he is owed $2,059,842.84, Elkins claims he is owed $2,705,528.23 for store #1 and $2,292,725.45 for store #2, and Lobana claims he is owed $1,375,526.97 for store #1 and $1,223,556.12 for store #2 for unreimbursed expanses and fees (plus pre-judgment interest).  Plaintiffs' Assessment of Damages, Dkt. 318.

("These guidelines and procedures may or may not be appropriate for every franchise.  The Franchisee is solely responsible for setting the policies and procedures to operate his or her business in accordance with the laws, regulations, and customs of its legal jurisdiction and in compliance with the Franchise Agreement.").  Indeed, for the most part, Plaintiffs do not even know what is contained in the Operations Manual, Trial Tr. (Dhillon) at 54:2-4[5], and Lobana and Elkins have never even read it, Trial Tr. (Lobana) at 284:3-18, (Elkins) at 353:6-354:1.[6]  Haitayan stated he followed only those portions of the Manual that he could accommodate.  Trial Tr. (Haitayan) at 178:19-180:4.[7]  And Plaintiffs did not receive a notice of material breach for failing to comply with the Operations Manual.  See, e.g., id. (Dhillon) at 55:10-20, (Haitayan) at 180:5-18.

### 2.   Training

As stated above, when Plaintiffs became franchisees, they participated in weeks-long mandatory training run by 7-Eleven. Dhillon Decl. ¶ 23; Haitayan Decl. ¶ 5; Lobana Decl. ¶ 14; Elkins Decl. ¶ 20.  7-Eleven provides the same training to franchisees and corporate store managers.  Trial Tr. (Yount) at 447:15:448:9.

### 3.   Field Consultants

7-Eleven assigns each franchisee a field consultant.  Dhillon Decl. ¶ 11; Haitayan Decl. ¶ 38; Lobana Decl. ¶ 6; Elkins Decl. ¶ 55; Rosencrans Decl. ¶ 29; dkt. 325 (Derrick Washington Declaration in Lieu of Live Direct Testimony [Washington Decl.]) ¶ 2.  7-Eleven uses the field consultants to ensure franchisees operate stores in accordance with 7-Eleven policies.  Trial Tr. (Yount) at 449:3-18.  Field consultants

---

[5] Dhillon was impeached on this point with his deposition testimony.  Tr. 53: 13-54:4.

[6] This is just one of numerous instances of inaccurate testimony provided by Plaintiffs in their declarations.

[7] Again, a responsive answer was provided only through Haitayan's deposition testimony.  Trial Tr. 178:19-180:4.

regularly text and email the franchisees to remind them of promotions and encourage them to sell more.  Dhillon Decl. ¶¶ 50-54; Haitayan Decl. ¶¶ 39-41; Lobana Decl. ¶ 46; Elkins Decl. ¶ 59; Exs. 1085-1093, 1102-1103, 1106-09; 1111, 1113-1115.

Field consultants visit the stores approximately once a week. Dhillon Decl. ¶ 50; Haitayan Decl. ¶ 39; Lobana Decl. ¶ 44; Elkins Decl. ¶ 56.  Franchisees are not required to be present for these visits.  See Trial Tr. (Haitayan) at 186:22-187:21, (Rosencrans) at 464:7-465:11. Field consultants use a form known as a "Guest Readiness Store Walk" to evaluate aspects of the store such as cleanliness and product placement.  Lobana Decl. ¶ 44; Ex. 1140.  They point out issues they observe.  Lobana Decl. ¶ 45.  Field consultants also communicate with franchisees when franchisees are in violation of 7-Eleven's procedures or when they want franchisees to concentrate on a specific goal.  Trial Tr. (Lobana) at 309:5-310:13; Exs. 1141, 1142.

Franchisees are not required to follow field consultants' suggestions.  Rosencrans Decl. ¶ 29; Washington Decl. ¶ 2.  Elkins stated his field consultant never required him to do anything.  Trial Tr. (Elkins) at 355:10-12.  Both he and Haitayan stated they did not always follow their field consultants' recommendations.  Id. (Haitayan) at 185:20-22, (Elkins) 354:12-25.  When Dhillon's field consultant recommended he participate in a promotion, Dhillon tore up the promotion materials and threw them in the trash.  Id. (Washington) at 429:18-430:8.

Field consultants track customer complaints submitted to 7-Eleven.  Haitayan Decl. ¶ 42; Ex. 1040.  Field consultants also follow up with franchisees about problems identified by "mystery shoppers" that 7-Eleven sends every month to rate the store on a number of criteria.  Dhillon Decl. ¶¶ 72-73; Haitayan Decl. ¶ 44; Lobana Decl. ¶¶ 52-53; Elkins Decl. ¶¶ 62-64; Yount Decl. ¶ 6; Trial Tr. (Washington) at 415:4-416:25.

### 4.     Store Premises

7-Eleven obtains the store lease for each franchisee and leases the premises in 7-Eleven's name.  Dhillon Decl. ¶ 33; Haitayan Decl. ¶ 12; Lobana Decl. ¶ 24; Elkins Decl. ¶ 27.  7-Eleven also obtains the business license for the store and provides all equipment for the store, such as the fountain drink machine and food service equipment. Haitayan Decl. ¶¶ 11, 25; Lobana Decl. ¶¶ 23, 32; Elkins Decl. ¶¶ 29, 41; Yount Decl. ¶¶ 10, 25; Trial Tr. (Rosencrans) at 481:6-13; Exs. 1032, 1033.  If repairs are needed for store equipment, franchisees arrange for service through 7-Eleven.  Dhillon Decl. ¶ 41; Haitayan Decl. ¶ 25; Lobana Decl. ¶ 32; Elkins Decl. ¶ 41.  Plaintiffs cannot replace any equipment or make any improvements to or renovate the stores; 7-Eleven makes these decisions.  Dhillon Decl. ¶ 42; Haitayan Decl. ¶ 25; Lobana Decl. ¶ 33; Elkins Decl. ¶ 42; Ex. 1174.  Plaintiffs cannot use their physical store locations except as a 7-Eleven store.  Ex. 1387 at 207.

Franchisees are generally required to keep the store open 24 hours a day, 7 days a week.  Dhillon Decl. ¶ 34; Haitayan Decl. ¶ 13; Lobana Decl. ¶ 25; Elkins Decl. ¶ 30; Exs. 141 at 29955, 1386 at 50, 1388 at 526, 1389 at 698, 1390 at 1101.  However, that has not always been true recently due to the COVID-19 pandemic.  See Trial Tr. (Dhillon) at 144:9-145:10.

7-Eleven places and operates video cameras that Plaintiffs cannot remove in each store.  Dhillon Decl. ¶ 34; Haitayan Decl. ¶ 14; Lobana Decl. ¶ 26; Elkins Decl. ¶ 31; Trial Tr. (Rosencrans) at 466:23-467:7.  7-Eleven also controls the temperatures in the stores remotely.  Trial Tr. (Rosencrans) at 466:4-15.  Franchisees cannot adjust the temperatures themselves, but they can request the temperature be adjusted.  Id. at 466:16-22; Dhillon Decl. ¶ 36; Haitayan Decl. ¶ 16; Lobana Decl. ¶ 27; Elkins Decl. ¶ 33.

7-Eleven provides franchisees with "planograms" that show how merchandise should be displayed in the store.  Dhillon Decl. ¶ 32; Elkins Decl. ¶ 26; Ex. 1164.  The planograms are recommendations;

franchisees are not required to follow them.  Trial Tr. (Haitayan) at 199:23-200:16; Rosencrans Decl. ¶ 14.  Plaintiffs often did not follow the planogram, but instead adjusted the layout of their stores based on what made sense for their business.  Trial Tr. (Haitayan) at 200:4-16, (Elkins) at 361:1-7.

### 5. Store Products

All franchisees used a 7-Eleven computer system, known as the ISP, to handle ordering merchandise.  Dhillon Decl. ¶ 27; Haitayan Decl. ¶ 10; Lobana Decl. ¶ 19; Elkins Decl. ¶ 24.  Franchisees must use the ISP system.  Trial Tr. (Stevens) at 488:14-21.  The ISP system recommends a quantity of each item to be ordered each week, which franchisees can choose whether to follow.  Dhillon Decl. ¶ 28; Haitayan Decl. ¶ 20; Lobana Decl. ¶ 20; Elkins Decl. ¶ 25; Trial Tr. (Rosencrans) at 467:8-469:10.  Recommendations are provided only if franchisees select that option, and franchisees can always change the quantities of recommended items.  Trial Tr. (Rosencrans) at 468:14-469:10.

7-Eleven schedules deliveries of the merchandise to the stores. Dhillon Decl. ¶ 32; Elkins Decl. ¶ 26; Exs. 1096, 1177.  Franchisees are required to carry certain 7-Eleven proprietary products in their stores, such as Slurpee.  E.g., Ex. 1387 at 289-290.  But Plaintiffs routinely decline to carry products 7-Eleven would like them to carry and instead carry only products they think make sense for their business.  Trial Tr. (Haitayan) at 195:4-198:8; Washington Decl. ¶¶ 5, 11, 16.  Franchisees must place store orders within two specific 24-hour windows. Rosencrans Decl. ¶ 26.  However, Plaintiffs do not have to place the orders themselves; their store managers can place the orders.  Trial Tr. (Elkins) at 367:14-19.

7-Eleven sets prices for store merchandise on the ISP system and notifies franchisees when there are changes to pricing.  Dhillon Decl. ¶ 31; Haitayan Decl. ¶ 19; Lobana Decl. ¶ 21; Elkins Decl. ¶ 25; Exs. 1112, 1172.  The franchise agreement makes clear that franchisees have no obligation to sell inventory items at 7-Eleven's suggested price. See, e.g., Ex. 220, ¶ 15(f); see also Washington Decl. ¶ 10; Rosencrans

Decl. ¶ 15; Trial Tr. (Dhillon) at 67:8-15, (Elkins) at 359:20-360:6. Plaintiffs have custom-priced products sold in their stores. Trial Tr. (Dhillon) at 67:8-15, (Haitayan) at 170:18-171:10, (Elkins) at 360:10-19. Haitayan custom-priced more than 50% of the merchandise in his store. Id. (Haitayan) at 170:18-21. Although Dhillon declared that he was "reprimanded" for custom pricing, Dhillon Decl. ¶ 31, actually he was only notified that he was losing money on an item at the price he decided to sell it. Ex. 1143; Trial Tr. (Dhillon) at 68:9-15.

The franchise agreement requires franchisees to purchase at least 85% of their merchandise from 7-Eleven recommended vendors. Ex. 1387 ¶ 15(g). Franchisees sometimes have trouble ordering non-recommended merchandise. Haitayan Decl. ¶ 22. 7-Eleven negotiates contracts with recommended vendors. Dhillon Decl. ¶ 40; Haitayan Decl. ¶ 19; Lobana Decl. ¶ 31; Elkins Decl. ¶ 37. However, Franchisees can generally select the vendors from whom they purchase the products they decide to carry. Rosencrans Decl. ¶ 16; Trial Tr. (Haitayan) at 194:1-20, (Lobana) at 281:20-282:3.

Franchisees may carry non-recommended items from vendors under contracts they negotiate themselves. Washington Decl. ¶ 11; Trial Tr. (Elkins) at 364:18-365:4. For instance, Dhillon carries non-recommended craft beers and designer waters. Washington Decl. ¶ 11.

7-Eleven hires a third-party company to conduct mandatory quarterly audits of merchandise; franchisees are charged for any missing merchandise. Trial Tr. (Rosencrans) at 465:22-24; Dhillon Decl. ¶ 21; Haitayan Decl. ¶ 34; Lobana Decl. ¶ 13; Elkins Decl. ¶ 18.

7-Eleven runs promotions, but franchisees are not required to participate. Rosencrans Decl. ¶ 18; Washington Decl. ¶ 6. Plaintiffs acknowledged that they were not required to participate in all promotions and did choose not to participate in promotions. Trial Tr. (Dhillon) at 72:23-73:1, (Haitayan) at 189:5-12, (Elkins) at 368:3-7. Dhillon often does not participate in promotions unless they are fully funded by vendors and refuses to put up signage for promotions even if supplied by 7-Eleven. Washington Decl. ¶ 6. Haitayan refused to

participate in many promotions.  Trial Tr. (Haitayan) at 189:13-17.  In his capacity as president of the 7-Eleven Franchise Owners Association of Southern California, Lobana advised the other 7-Eleven franchisees to make their own business decisions concerning a particular promotion that did not seem profitable at some stores.  Ex. 156.  Plaintiffs generally participated in a promotion only if they decided it made financial sense for their businesses.  Id. (Haitayan) at 189:18-23, (Lobana) at 278:2-8, (Elkins) at 368:8-11.  Some Plaintiffs ran their own promotions, including for non-recommended brands and without requesting approval.  Washington Decl. ¶ 9, Trial Tr. (Dhillon) at 73:14-19, (Elkins) at 368:12-369:7.

### 6.    Plaintiffs' Work and Schedules

7-Eleven does not require its franchisees to be in their stores on a specific schedule or for a certain number of hours.  Rosencrans Decl. ¶ 21.  Plaintiffs work when they want to and visit their stores when they choose.  Trial Tr. (Dhillon) at 61:15-20, (Lobana) at 262:5-17, (Elkins) at 373:21-23.  Plaintiffs do not need 7-Eleven's permission to take vacations.  Id. (Dhillon) at 62:12-14, (Lobana) 262:18-23, (Elkins) at 373:24-374:2.

Lobana, Haitayan, and Dhillon admitted that when they chose to work, they did not wear a uniform.  Id. (Dhillon) at 59:25-60:5, (Haitayan) at 203:25-204:2, (Lobana) at 283:20-22.  None received a notice of material breach or letter of notice for failing to wear a uniform.  Id. (Dhillon) at 60:25-61:7, (Lobana) at 283:24-284:2.

Some of the Plaintiffs have other business endeavors.  Lobana owned a Circle K franchise that he sold in 2018.  Id. (Lobana) at 260:12-17, 260:24-261:5.  He currently owns an engineering consulting company from which he earns "considerably more" than from his 7-Eleven franchises.  Id. at 260:10-11, 266:8-14.  He spends 40-50 hours per week at his engineering business and only 3-4 hours a week at each of his 7-Eleven stores.  Id. at 261:12-262:4.

Haitayan owns a car wash and gas station and its underlying property, the real estate on which his 7-Eleven franchise was located,

and an income property.  Id. (Haitayan) at 210:25-211:21.  Dhillon owns a commercial real estate management company from which he earned more than $100,000 in 2020.  Id. (Dhillon) at 85:10-16, 86:16-23.

### 7.    Store Employees

Plaintiffs had sole control and authority over employment decisions including hiring, firing, wages, staffing, scheduling, and discipline.  Id. (Dhillon) at 64:1-66:14, (Haitayan) at 201:25-202:16, (Lobana) at 271:15-273:1, (Elkins) at 369:16-370:10.  While 7-Eleven provided franchisees with instructions about an online hiring tool, use of that tool was optional.  Elkins Decl. ¶ 48; Trial Tr. (Elkins) at 370:16-371:25.

Employees must complete 7-Eleven's training.  Dhillon Decl. ¶ 45; Haitayan Decl. ¶ 35; Lobana Decl. ¶ 36; Elkins Decl. ¶ 47. Franchisees must verify to 7-Eleven that store employees have completed annual recertification training on certain topics.  Dhillon Decl. ¶ 45; Haitayan Decl. ¶ 35; Lobana Decl. ¶ 36; Elkins Decl. ¶ 47.

Store employees are required to wear uniforms and name tags. Dhillon Decl. ¶ 45; Lobana Decl. ¶ 38; Elkins Decl. ¶ 47; Trial Tr. (Stevens) at 508:3-5; Ex. 1387 ¶ 26(a)(2)(f).

Until 2019, payroll for store employees was processed through the 7-Eleven ISP system, Haitayan Decl. ¶ 36; Lobana Decl. ¶ 39; Elkins Decl. ¶ 51, which functioned like any other payroll company. Trial Tr. (Haitayan) at 202:17-21.  7-Eleven obtains workers' compensation insurance for store employees that it charges to franchisees.  Dhillon Decl. ¶ 48; Haitayan Decl. ¶ 37; Lobana Decl. ¶ 42; Elkins Decl. ¶ 54.

### 8.    Material Breaches and Letters of Notification

In their declarations in lieu of direct examination, Plaintiffs do not identify receipt of any notice of a material breach or letter of notification.  At trial, it was elicited that in his two decades as a franchisee, Dhillon has received notice of a material breach only once for falling below the minimum amount he was required to have in his

14

store's bank account.  Trial Tr. (Dhillon) at 55:10-20, 110:1-15.  He has never received a letter of notification.  Id.  Lobana received a letter of notification for falling below the required minimum in his store's bank account.  Id. (Lobana) at 306:9-307:3.

Haitayan testified at trial that he was not sure whether he ever received notice of a material breach for not complying with the Operations Manual, but in his deposition he had testified that he had not.  Id. (Haitayan) at 180:13-18.  Elkins stated he did not suffer any consequences for the failure to follow any advice or recommendation from his field consultant.  Id. (Elkins) at 355:5-9.

### 9.      Store Finances and Accounting

Franchisees must deposit all sales proceeds into a store bank account.  Dhillon Decl. ¶ 15; Haitayan Decl. ¶ 27; Lobana Decl. ¶ 8; Elkins Decl. ¶ 12; Trial Tr. (Stevens) at 495:8-17.  7-Eleven has control of the store bank account.  Haitayan Decl. ¶ 27.  7-Eleven divides gross profits between franchisees and 7-Eleven and also charges franchisees a number of expenses such as maintenance expense.  Trial Tr. (Stevens) at 493:5-494:20, 499:5-21.

### 10.      Profitability and Franchisees' Pay

Franchisees must maintain a balance of around $10,000 in the store account.  Yount Decl. ¶ 22.  Plaintiffs could choose to pay themselves via draws with the amount in the account that exceeds the required minimum.  Trial Tr. (Stevens) at 509:6-12; Dhillon Decl. ¶ 19; Haitayan Decl. ¶ 32; Lobana Decl. ¶ 12; Elkins Decl. ¶ 17; Yount Decl. ¶ 22.  They could choose to take weekly, monthly, additional, and excess draws.  Yount Decl. ¶ 22.

From 2014 through 2019, Elkins took draws of between $49,000 and $108,200 a year from each of his two stores.  Stevens Decl., Ex. A. In 2017, his draws totaled $187,000.  Id.  From 2014 through 2019, Lobana took draws between $55,964.99 and $153,268.97 per year from each of his two stores.  Id.  In 2019, his draws for both stores totaled $277,659.68.  Id.  In those same years, Dhillon took draws of between

$18,000 and $59,000 each year.  Id.  Additionally, from October 2013 through December 2019, Dhillon paid his wife as much as $78,000 a year.  Id. ¶ 14.  Haitayan took draws between $40,000 and $270,000 each year.  Id., Ex. A.  The average salary for a store manager of a corporate-owned 7-Eleven store in California in 2016 was $48,998.  Yount Decl. ¶ 24.

With some exceptions, each Plaintiff had control over his stores' operating expenses.  Trial Tr. (Elkins) at 332:14-21; Stevens Decl. ¶ 12.  Plaintiffs' expenses varied widely.  For instance, certain expenses for each of Lobana's stores were between $33,000 and $38,000 while the same expenses for Haitayan's store were over $444,000.  Stevens Decl. ¶ 25.

## II. CONCLUSIONS OF LAW

### A.    Burden of Proof

There appears to be some conflict among authority about which party has the burden of proof in this case.  See dkt. 346-1 at 16.  However, the Ninth Circuit, applying California law, has held "the burden of proof is on the party attacking the employment relationship."  Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 992 (9th Cir. 2014) (quoting Bemis v. People, 109 Cal. App. 2d 253, 263-64 (1952); see also Ruiz v. Affinity Logistics Corp., 754 F.3d 1093, 1100 (9th Cir. 2014) (holding that "once a plaintiff comes forward with evidence that he provided services for an employer," the burden "shifts to the employer" to prove the employee was an independent contractor).[8]  The Court assumes for this purpose that 7-Eleven bears the burden of proving that Plaintiffs are independent contractors.

---

[8] 7-Eleven attempts to cabin such cases to the workers' compensation context, see dkt. 346-1 at 16-17, but in Alexander the Ninth Circuit explicitly noted that California courts have placed the burden on the party attacking the employment relationship "in a range of cases outside of the workers' compensation context."  765 F.3d at 992.

**B.**   **_Borello_ Test**

In its February 8, 2021 Order, the Court determined that the _Borello_ test applied to Plaintiffs' claims under section 2802.  Dkt. 275 at 7-10.  Under _Borello_, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired . . . ."  S. G. Borello & Sons, Inc. v. Dep't of Indus. Rels., 48 Cal. 3d 341, 350 (1989) (alterations in original) (quoting Tieberg v. Unemployment Ins. App. Bd., 2 Cal. 3d 943, 946 (1970)).  "This right of control need not extend to every possible detail of the work.  Rather, the relevant question is whether the entity retains 'all necessary control' over the worker's performance."  O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1138 (N.D. Cal. 2015) (quoting _Borello_, 48 Cal. 3d at 357).  The pertinent question is "not how much control a hirer _exercises_, but how much control the hirer retains the _right_ to exercise."  Ayala v. Antelope Valley Newspapers, Inc., 59 Cal. 4th 522, 533 (2014).  An employer's right to discharge at will, without cause, is strong evidence of an employment relationship.  _Borello_, 48 Cal. 3d at 350; Narayan v. EGL, Inc., 616 F.3d 895, 900 (9th Cir. 2010).

However, a company "may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract – including the right to inspect, . . . the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work – without changing the relationship from that of owner and independent contractor or the duties arising from that relationship."  McDonald v. Shell Oil Co., 44 Cal. 2d 785, 790 (1955) (citations omitted); see also Varisco v. Gateway Sci. & Eng'g, Inc., 166 Cal. App. 4th 1099, 1103 (2008) ("the right to exercise complete or authoritative control, rather than mere suggestion as to detail, must be shown").

Although the right to control is the "most important" consideration, the _Borello_ test considers a number of secondary factors to account for the "infinite variety" of relationships.  _Borello_, 48 Cal. 3d at 350-51.  These factors include:

17

(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

Id. at 351. The secondary Borello factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." Id. (quoting Germann v. Workers' Comp. Appeals Bd., 123 Cal. App. 3d 776, 783 (1981)). Additionally, "[t]he nature of the work, and the overall arrangement between the parties, must be examined to determine whether they come within the 'history and fundamental purposes' of the statute." Id. at 353-54 (quoting Laeng v. Workmen's Comp. Appeals Bd., 6 Cal. 3d 771, 777 (1972)). No one factor "is dispositive when analyzing employee/independent contractor status." O'Connor, 82 F. Supp. 3d at 1140.

## C.   Nature of the Franchising Business

The Court notes that analyzing whether someone is an independent contractor in the franchising context is unique because franchising is governed by state and federal regulations. For instance, the Federal Trade Commission (FTC) promulgated a series of regulations collectively called the "FTC Franchise Rule." 16 C.F.R. § 436.1, et seq. The FTC Franchise Rule defines a franchise as a relationship in which the franchisor represents that it "will exert or has the authority to exert a significant degree of control over the

franchisee's method of operation, or provide significant assistance in the franchisee's method of operation." Id. § 436.1(h)(2).

In Patel v. 7-Eleven, Inc., 485 F. Supp. 3d 299, 310 (D. Mass. 2020), a district court concluded that "[i]t cannot be the case . . . that, in qualifying as a franchisee pursuant to the FTC's definition, an individual necessarily becomes an employee.  In effect, such a ruling by this Court would eviscerate the franchise business model, rendering those who are regulated by the FTC Franchise Rule criminally liable for failing to classify their franchisees as employees." See also Linton v. Desoto Cab Co., Inc., 15 Cal. App. 5th 1208, 1223 (2017) ("A putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation.").

However, this Court need not rely on the rule articulated in Linton to conclude that Plaintiffs are independent contractors.  The extensive control exercised by Plaintiffs, in conjunction with the other relevant factors such as their ability to control their own hours and sell their businesses, is determinative.

## D.    Control Over Manner and Means

The evidence shows that Plaintiffs had the right to control the manner and means for accomplishing their work.

Plaintiffs admitted on cross-examination that they have complete control over when they work, how much they work, and when they take vacations.  See Hennighan v. Insphere Ins. Sols., Inc., 38 F. Supp. 3d 1083, 1100 (N.D. Cal. 2014) ("An individual who determines his own hours and break times 'on most days' exercises 'meaningful discretion.'") (quoting Beaumont-Jacques v. Farmers Grp., Inc., 217 Cal. App. 4th 1138, 1145 (2013)), aff'd 650 F. App'x 500 (9th Cir. 2016). While some Plaintiffs chose to work in their stores on a day-to-day basis, others, like Lobana, spent very little time at their stores.  See Missions Ins. Co. v. Workers' Comp. Appeals Bd., 123 Cal. App. 3d 211, 223 (1981) (holding the question of whether an individual is an independent contractor can "be answered conclusively by the fact that

the [parties'] contract [does] not even require that the services be performed by [the worker] personally").

Plaintiffs also employed multiple individuals to work in their stores and exercised total control over the hiring, firing, wages, discipline, schedule and staffing of their employees.  See Beaumont-Jacques, 217 Cal. App. 4th at 1144-45 ("Appellant exercised meaningful discretion by, for instance, recruiting agents for and, when selected, training and motivating those agents to sell the [defendants'] products; determining her own day-to-day hours, including her vacations; on most days, fixing the time for her arrival and departure at her office and elsewhere, including lunch and breaks; preparing reports for and attending meetings of the [defendants]; hiring and supervising her staff, i.e., those who worked at her office, while remitting payroll taxes for them as employees; [and] performing other administrative tasks . . . .").

Plaintiffs argue that the fact that 7-Eleven requires uniforms of franchisees and their employees indicates employee status.  See dkt. 347-1 at 32-33.  Controlling workers' appearance generally indicates employee status.  See Narayan, 616 F.3d at 902 (regulating workers' appearance, by requiring them to wear defendant's branded shirt and safety boots and carry defendant's ID card, pointed towards employee status).

But the uniform program document Plaintiffs submit does not state when uniforms must be worn.  See Ex. 1037.  Lobana, Haitayan, and Dhillon admitted they typically did not wear a uniform when they chose to work.  Trial Tr. (Dhillon) at 59:25-60:5, (Haitayan) at 203:15-204:2, (Lobana) at 283:10-22.  They do not claim to have been disciplined for failing to wear a uniform.  Id. (Dhillon) at 60:25-61:7, (Lobana at) 283:24-284:2.

The asserted uniform requirements are also not as detailed as those in other cases.  In Ruiz, for instance, the Ninth Circuit noted the defendants controlled "every exquisite detail" of the drivers' appearance, including the "color of their socks" and "the style of their

hair."  754 F.3d at 1101-02; see also Alexander, 765 F.3d at 989
("FedEx controls its drivers' clothing from their hats down to their
shoes and socks.").  7-Eleven's franchisees can wear dark or khaki
slacks or skirts and a few different shirt options.  Ex. 1037.  Closed-toe
shoes and either socks or hose are required, but there is no other
requirement as to the type of shoe or the color of the socks.  Id.  Given
the apparently flexibility of the policy and the policy itself, the uniform
requirement weighs only slightly in favor of employment status.

Plaintiffs also had a large amount of control over the operation of
their stores.  Plaintiffs, with a few exceptions, determined which
products to carry.  They decided how to price and promote the products
they chose.  They followed 7-Eleven's guidance on price and promotions
only if they thought it made sense for their business.  They never
received a letter of notification or notice of material breach for failing to
follow 7-Eleven pricing or promotions.  7-Eleven did not control the
ordering process and store inventory.  Although Plaintiffs ordered
inventory through 7-Eleven's system, Plaintiffs determined the
products they would carry, the quantity of those products, and their
prices.

Plaintiffs argue 7-Eleven's monitoring and supervision of
Plaintiffs' work through field consultants evidence control because field
consultants visited stores approximately once a week and would
frequently send texts and emails of new products, prices, promotions,
and product focuses.  Dkt. 347-1 at 26-27.  A once-a-week meeting is
not the level of supervision in a typical employee-employer relationship.
In Ruiz, 754 F.3d at 1102, which Plaintiffs rely on in support of their
argument, dkt. 347-1 at 27, Affinity required drivers to report to the
warehouse every morning and attend a meeting, inspected drivers'
appearance and the loading of their trucks, required drivers to call
their supervisor after every two to three stops, monitored the progress
of each driver on a screen, and contacted drivers if they were running
late or off course.  This is not the same as a weekly meeting.  In any
event, franchisees were not required to be present for these meetings.

And frequent email and text updates do not qualify as supervision because Plaintiffs are free to ignore these missives.[9]

The other cases Plaintiffs cite also demonstrate a much more pervasive level of supervision than is present here.  In Espejo v. The Copley Press, Inc., 13 Cal. App. 5th 329, 345 (2017), employees would sometimes go to a carrier's residence to wake up the carrier if the carrier failed to arrive at the distribution center on time.  And in Alexander, 765 F.3d at 993, FedEx required its drivers to load and unload packages at FedEx terminals every day, assigned drivers a service area, selected which packages they delivered, and paid them on a regular schedule.

The evidence established that field consultants did not have control over day-to-day operations.  While field consultants could issue letters of notification, these were for failure to follow only certain rules that did not largely control daily operations.  Plaintiffs admitted they followed their field consultants' recommendations only if they thought the recommendations made sense for their business.  They also admitted they suffered no consequences when they decided not to follow those recommendations.  "Whether a right to control exists may be measured by asking whether or not, if instructions were given, they would have to be obeyed on pain of at-will discharge for disobedience." Ayala, 59 Cal. 4th at 533 (brackets and quotation marks omitted).  Under that measure, 7-Eleven did not have the right of control.  Additionally, the Operations Manual did not control Plaintiffs' operations.  Plaintiffs were in large part unfamiliar with it and the Manual itself states it provides guidance.

Plaintiffs were required to attend training when they became franchisees.  This weighs somewhat in favor of employee status.  "But required meetings or training do not necessarily indicate an employment relationship."  Hennighan, 38 F. Supp. 3d at 1101; Mission

---

[9] 7-Eleven does have video cameras it monitors at every store.  However, Plaintiffs did not provide any evidence that 7-Eleven uses these cameras to monitor the franchisees rather than monitor for theft.

Ins. Co., 123 Cal. App. 3d at 221 (that plaintiff "on occasion attended lecture or classes concerning proper methods of installation and service was not evidence that Morse controlled *the manner in which the desired result was to be achieved*").  Plaintiffs have been franchisees for decades, but they had not been trained for decades.  The trainings were not a regular part of their job.

"Perhaps the strongest evidence of the right to control" is the right to "discharge the worker without cause."  Ayala, 59 Cal. 4th at 531; see also Alexander, 765 F.3d at 988 ("The right to terminate at will, without cause, is strong evidence in support of an employment relationship." (brackets and quotation marks omitted)).  7-Eleven can terminate a franchisee if the franchisee commits specified material breaches, subject to the limitations imposed by the California Franchise Relations Act, which prohibits the termination of a franchisee without good cause.  See Cal. Bus. & Prof. Code §§ 20020-20021.

Plaintiffs argue this factor weighs in favor of an employment relationship because the permitted justifications are broad enough that a company could effectively terminate a worker for any reason.  Dkt 347-1 at 24-25; see Alexander, 765 F.3d at 995 (determining that agreement that allowed FedEx to "fire a driver for any breach or failure to perform contractual obligations, which would cover, for example, any failure to act with proper decorum at all times or to foster the professional image and good reputation of FedEx" weighed against FedEx's argument that the drivers were independent contractors (brackets, ellipsis, and quotation marks omitted); Estrada v. FedEx Ground Package Sys., Inc., 154 Cal. App. 4th 1, 9 (2007) ("The [trial] court described the Operating Agreement as 'a brilliantly drafted contract creating the constraints of an employment relationship with [the drivers] in the guise of an independent contractor model' – because FedEx 'not only has the right to control, but has close to absolute control over [the drivers] based upon interpretation and obfuscation.'" (second and third alterations in original)).

7-Eleven was able to terminate Plaintiffs only for good cause and a material breach.  In most cases, franchisees would be given notice of the material breach before termination and time to cure the breach.  The material breaches for which franchisees would not be given time to cure (though they were typically given notice), were very limited, for instance a petition for bankruptcy, conviction of a felony, and violation of anti-terrorism laws.  See Ex. 1037 ¶ 26(a).  For the more general types of material breaches, such as not properly maintaining the store, not operating the store for the determined number of hours, or not complying with any agreements between the franchisee and 7-Eleven, Plaintiffs had a right to cure.  Id.  Plaintiffs, on the other hand, could terminate the franchise agreement with 72-hour notice.  Id. ¶ 27(b).  This is not at-will employment.  See Arnold v. Mut. of Omaha Ins. Co., 202 Cal. App. 4th 580, 589 (2011) ("[A] termination at-will clause for both parties may properly be included in an independent contractor agreement, and is not by itself a basis for changing that relationship to one of an employee.").

Taking all of this into account, the primary Borello factor, control, compels the conclusion that Plaintiffs were independent contractors.  The evidence establishes that Plaintiffs exercised their own judgment in determining, among other things: what products they would carry, how to price the products, how to organize the store, what promotions to take part in, whom to hire or fire, the scheduling of employees, how often and when Plaintiffs would be present at their stores, and what draws to take from the stores and when.  The significant control Plaintiffs exercised over their businesses establishes that they are independent contractors.

## E.   Secondary Factors

A number of the secondary Borello factors also support 7-Eleven's contention that Plaintiffs are independent contractors.

### 1.   Distinct Business

In concluding the Borello plaintiffs were employees, the California Supreme Court noted that they "engage in no distinct trade

or calling" and "[t]hey do not hold themselves out in business." 48 Cal. 3d at 357. "If a worker is engaged in a distinct occupation or business, then that would suggest that the worker is an independent contractor rather than an employee." Harris v. Vector Mktg. Corp., 656 F. Supp. 2d 1128, 1138-39 (N.D. Cal. 2009).

In the statute that defines "franchises," the California legislature repeatedly characterizes franchises as "businesses" and the relationship created between a franchisor and a franchisee as a "business relationship," not an employment relationship. See, e.g., Cal. Corp. Code §§ 31001, 31005(a)(2). The case law accords with this view. See, e.g., GTE Sylvania Inc. v. Cont'l T.V. Inc., 537 F.2d 980, 999 (9th Cir. 1976) (franchising "creates a class of independent businessmen; it provides the public with an opportunity to get a uniform product at numerous points of sale from small independent contractors, rather than from employees of a vast chain"), aff'd sub nom. Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977); Patterson v. Domino's Pizza, LLC, 60 Cal. 4th 474, 488-89 (2014) (discussing the business format of franchising).

This characterization is consistent with the evidence presented at trial. It is undisputed that Plaintiffs had the right to sell, and in some cases sold, their franchise to others. See Desimone v. Allstate Ins. Co., No. C 96-03606 CW, C 99-02074 CW, 2000 WL 1811385, at *16 (N.D. Cal. Nov. 7, 2000) (concluding the plaintiffs were independent contractors because, among other factors, the "[p]laintiffs ha[d] a transferable economic interest in their Allstate books of business"). Elkins sold one of his two franchises for $350,000 in 2020, and Dhillon testified he is looking to sell his franchise for $500,000. Trial Tr. (Dhillon) at 90:20-91:4, (Elkins) at 321:19-322:11.

Some Plaintiffs own or owned competitive businesses. See Hennighan, 38 F. Supp. 3d at 1102 ("The fact that [the plaintiff] sold insurance on behalf of other companies supports his classification as an independent contractor."). Dhillon owned a Quiznos sandwich franchise, Dhillon Decl. ¶ 9, and Lobana owned and operated a competing convenience store, Trial Tr. (Lobana) at 260:12-17.

Haitayan continues to operate his convenience store even though his franchise agreement with 7-Eleven terminated.  Trial Tr. (Haitayan) at 224:9-19; see Hennighan, 38 F. Supp. 3d at 1102 (that the plaintiff "continued selling insurance after the termination of his contract" supported the conclusion that he was engaged in a distinct business).

Plaintiffs held themselves out as business owners.  See Harris, 656 F. Supp. 2d at 1138-39 (analyzing this factor and considering whether plaintiff "held herself out as a separate occupation or business").  Haitayan characterized himself as a business owner on social media, Trial Tr. (Haitayan) at 210:20-24, and in emails and other communications to fellow franchisees, Ex. 203.  All Plaintiffs identified themselves as self-employed in their tax returns.  A plaintiff who exercises discretion by "deducting . . . costs as a business expense in her personal tax returns[,] and, identifying herself as self-employed in those returns," is more likely to be an independent contractor.  Beaumont-Jacques, 217 Cal. App. 4th at 1144-45; see also Hennighan, 38 F. Supp. 3d at 1102 ("Hennighan also identified himself as self-employed in his tax returns, thereby weighing in favor of an independent-contractor relationship.").

This factor weighs in favor of 7-Eleven.

## 2.    Plaintiffs' Performance

The next factor – whether the worker performs under the direction of a principal – "is largely duplicative of the control factor."  Hennighan, 38 F. Supp. 3d at 1103 (quoting Harris, 656 F. Supp. 2d at 1139).  As the Court discussed in more detail above, Plaintiffs were not subject to the control of a field consultant.  The field consultants provided advice and recommendations that Plaintiffs were not required to follow and often did not follow.  Plaintiffs suffered no consequences as a result of their failure to follow field consultants' recommendations.

This factor weighs in favor of 7-Eleven.

### 3.    Skill Required

"Where no special skill is required of a worker, that fact supports a conclusion that the worker is an employee instead of an independent contractor." Harris, 656 F. Supp. 2d at 1139.  If skill is required, it indicates independent contractor status.  See, e.g., State Comp. Ins. Fund v. Brown, 32 Cal. App. 4th 188, 202-03 (1995) (truck drivers were independent contractors because "truck driving – while perhaps not a skilled craft – requires abilities beyond those possessed by a general laborer").

Prior experience operating a convenience store is not required for franchisees.  Trial Tr. (Rosencrans) at 479:24-480:14.  But 7-Eleven provides franchisees with extensive training prior to managing a 7-Eleven store.  The extensive training indicates skill was required as training would not be necessary if the job required only abilities possessed by a general worker.

Plaintiffs have stated that an individual must be "very skilled" to handle the operation of a 7-Eleven store, dkt. 216-1 ¶ 53, and Haitayan admitted 7-Eleven franchisees are "savvy businessmen running million dollar operations."  Ex. 213; Trial Tr. (Haitayan) at 192:23-25.  Elkins said his marketing degree had "absolutely" been helpful in operating his stores and a store's sales and earnings are affected by a franchisee's efforts and abilities.  Trial Tr. (Elkins) at 358:9-20.

A franchisee's success is directly tied to his business savvy in operating his store or stores.  For instance, although Dhillon's and Lobana's stores generated around the same amount in gross sales, Lobana's stores were much more profitable because he managed his store's expenses differently.  See Exs. 1334, 1370; Stevens Decl., Ex. A.  Plaintiffs made many decisions, including about products, prices, promotions, and staffing their stores, which they conceded had a direct impact on their profits.  Trial Tr. (Haitayan) at 170:18-171:10, (Elkins) at 358:22-359:19; see 7-Eleven, Inc. v. Sodhi, No. 13-3715 (MAS) (JS), 2016 WL 3085897, at *6 (D.N.J. May 31, 2016) (concluding this factor weighed against finding a 7-Eleven franchisee was an employee

because plaintiff demonstrated business-like initiative), <u>aff'd sub nom.</u> <u>7 Eleven Inc v. Sodhi</u>, 706 F. App'x 777 (3d Cir. 2017).

This factor weighs in 7-Eleven's favor.

### 4. Supplier of Instrumentalities, Tools, and Place of Work

A worker is typically found to be an independent contractor when he supplies the tools and instrumentalities of his trade. <u>Hennighan</u>, 38 F. Supp. 3d at 1103-04. While all 7-Eleven franchisees own the merchandise in their stores, 7-Eleven provides everything else Plaintiffs need, including the store and the store equipment such as the fountain drink machine and food service equipment. Dhillon Decl. ¶ 41; Haitayan Decl. ¶ 25; Lobana Decl. ¶ 32; Elkins Decl. ¶ 41; Yount Decl. ¶¶ 10, 25. Typically, 7-Eleven leases or acquires the land, leases or builds the store, attaches the utilities, and installs computer systems for a franchisee. Yount Decl. ¶ 10.

This factor weighs in favor of Plaintiffs. <u>See</u> <u>Ruiz</u>, 754 F.3d at 1104 (holding that fact drivers did not own the trucks or cell phones but only leased them from the defendant to perform their work for the defendant weighed in favor of employee status); <u>Flores v. Velocity Express, LLC</u>, 250 F. Supp. 3d 468, 488-89 (N.D. Cal. 2017) (plaintiffs' investment in vehicles, safety equipment, uniforms, and other miscellaneous expenses was minimal compared to defendant's multi-million-dollar investments in technology solutions, leases, real estate, and equipment).

### 5. Length of Time for Performance of Services

"Where a worker is employed for a lengthy period of time, the relationship with the employer looks more like an employer-employee relationship." <u>Harris</u>, 656 F. Supp. 2d at 1140; <u>see also</u> <u>Flores</u>, 250 F. Supp. 3d at 492 ("Boconvi's short term of employment and the other Plaintiffs' testimony regarding a lack of exclusivity reasonably suggest that the plaintiffs were independent contractors, not employees."). The franchise agreements often had terms of 15 years. Each Plaintiff

managed 7-Eleven stores for decades.  Such lengthy tenures indicate employment status.  See Valdez v. CSX Intermodal Terminals, Inc., 298 F. Supp. 3d 1254, 1283 (N.D. Cal. 2018) (plaintiffs' relationships with defendant were "fairly permanent, with each lasting at least over a year" and, therefore, indicative of an employer/employee relationship); Estrada, 154 Cal. App. 4th at 12 (fact that most drivers had worked for FedEx for a long period of time – eight years on average – weighed in favor of an employment relationship).

This factor generally would weigh in Plaintiffs' favor.  But it would not make economic sense for a franchisee to invest in a franchise with a term too short for the franchisee to recoup his or her investment.  Here, this factor is neutral.

### 6.    Method of Payment

Hourly payment typically favors employee status and per job payment typically favors independent contractor status.  Alexander, 765 F.3d at 996.  Here, Plaintiffs were not guaranteed any pay by 7-Eleven.  Their income was entirely dependent on the profits they generated operating their franchises.  Trial Tr. (Dhillon) at 88:2-11.  This factor weighs in favor of 7-Eleven.  See Arnold, 202 Cal. App. 4th at 589 (concluding insurance agent was an independent contractor in part because her payment "was based on her results and not the amount of time she spent working on Mutual's behalf"); Desimone, 2000 WL 1811385, at *14 ("The fact that Plaintiffs are paid solely on commission and incur their own expenses in running their agencies without any reimbursement from Defendant weighs in favor of independent contractor status . . . .").

### 7.    Regular Business of the Principal

The Court next considers whether the work Plaintiffs perform is essential to 7-Eleven's core business.  See Alexander, 765 F.3d at 996.  The parties differ as to how they characterize 7-Eleven's core business.  Plaintiffs assert 7-Eleven is in the business of operating convenience stores.  Trial Tr. at 17:17-20.  7-Eleven presented evidence that franchising is 7-Eleven's core business.  Yount Decl. ¶ 3.  7-Eleven

compares this case to <u>Curry v. Equilon Enterprises, LLC</u>, 23 Cal. App. 5th 289, 307 (2018), in which Shell owned fueling stations in California but did not employ people at the gas stations.  The court held "Shell was not in the business of operating fueling stations – it was in the business of owning real estate and fuel."  <u>Id.</u>

The Court agrees the evidence shows 7-Eleven's core business is franchising, not operating convenience stores.  7-Eleven primarily locates and develops store sites, markets and sells franchises, licenses the right to use its intellectual property, develops an operations manual that sets forth its recommended practices, leases property and equipment, conducts advertising, develops new products, and provides back office support and business advisory assistance to franchisees. Yount Decl. ¶¶ 5-6, 8; Rosencrans Decl. ¶¶ 17, 30.  Plaintiffs do none of these things.  Instead, they order and price products, maintain equipment, hire and oversee employees, and operate the stores.

This is consistent with the California legislature's treatment of franchising as a distinct form of business.  The legislature refers to "the widespread sale of franchise" as a "form of business."  Cal. Corp. Code § 31001.  In contrast, franchisees are those who "engage in the business of offering, selling or distributing goods or services under" the franchisor's operating system.  <u>Id.</u> § 31005(a)(1); <u>see also</u> § 31007 (defining franchisor as "a person who grants a franchise").

That 7-Eleven operates some company-owned locations does not compel a different result.  Company-owned stores typically account for only between 1 and 2.5% of 7-Eleven locations in California.  Yount Decl. ¶ 19.  These stores are dedicated to training new franchisees and corporate staff, are being run on a temporary basis until they can be offered to franchisees or are in the process of being closed.  <u>Id.</u> ¶¶ 16-17. They also account for a relatively small amount of profits.  7-Eleven's expert witness Francine Lafontaine explained that economists define a company's regular course of business by the predominant manner in which the company generates profits.  <u>See</u> dkt. 330 ¶ 54.  In 2017, 2018, and 2019, the net profits of company-owned stores in California

accounted for approximately 1% of the royalties 7-Eleven earned from its franchised stores in California.  Yount Decl. ¶ 19.

As the Court previously pointed out, dkt. 222 at 14-15 n.6, the Ninth Circuit's skepticism about "the business of franchising" under the ABC test was targeted "especially [at] the cleaning franchise industry."  Vazquez v. Jan-Pro Franchising Int'l, Inc., 923 F.3d 575, 599 (9th Cir. 2019), reh'g granted, opinion withdrawn, 930 F.3d 1107 (9th Cir. 2019), and on reh'g, 939 F.3d 1045 (9th Cir. 2019), certified question answered, 10 Cal. 5th 944, 478 P.3d 1207 (2021), and opinion reinstated in part on reh'g, 939 F.3d 1050 (9th Cir. 2019).  There are significant factual differences between the cleaning franchises discussed in Vazquez and 7-Eleven's convenience store franchises that limit the applicability of that case to the facts here.  See id. at 579-80, 595-596 (discussing the operation of defendant's "three-tier franchise structure" and concluding that the top-level franchisor ("a major international janitorial cleaning business") was the employer of the bottom-level "unit franchisees" (individual janitors) who had purchased their franchises from "intermediary 'master franchisees'"); dkt. 222 at 14-15 n.6.  The Ninth Circuit found the distinction made in Curry – that Shell was not in the business of operating fueling stations – "significantly less troublesome" than the cleaners.  Vazquez, 923 F.3d at 599.

This factor weighs in favor of 7-Eleven.

### 8.  Parties' Beliefs

The final Borello secondary factor is "whether or not the parties believe they are creating the relationship of employer-employee."  Borello, 48 Cal. 3d at 351.

For decades Plaintiffs held themselves out as – and conducted themselves as – independent businessmen both before and after the filing of this lawsuit.  Lobana, as president of the FOASC, even advised the other 7-Eleven franchisees to make their own business decisions concerning a particular promotion that did not seem profitable at some stores.   Haitayan reminded other franchisees that they were

independent contractors and stated publicly that he was not a store manager who could be terminated at will.  In the franchise agreements they signed, Plaintiffs acknowledged and agreed that they were independent contractors and controlled the manner of means of their stores' operations.  "When, as here, the parties have entered into a written agreement setting forth the details of their relationship and, indeed expressly stating the legal relationship they intended to create, such agreement is a significant factor for consideration. . . .  Thus a lawful agreement between the parties expressly stating that the relationship created is that of independent contractor should not be lightly disregarded when both parties have performed under the contract and relied on its provisions. . . ."  Missions Ins. Co., 123 Cal. App. 3d at 226 (quoting Tieberg, 2 Cal. 3d at 951-52).  With contracts of adhesion, however, "California law is clear that '[t]he label placed by parties on their relationship is not dispositive.'"  Alexander, 765 F.3d at 989 (alteration in original) (quoting Borello, 48 Cal. 3d at 349).  And the "belief of the parties as to the legal effect of their relationship is not controlling if as a matter of law a different relationship exists."  Grant v. Woods, 71 Cal. App. 3d 647, 654 (1977).

Although each Plaintiff asserted that he came to believe he was a 7-Eleven employee, the Court found that testimony unconvincing.  To the limited extent this factor should be considered, it favors 7-Eleven.

\*   \*   \*

For Plaintiffs to prevail on their claim under Labor Code section 2802, they would have to have been employees.  Ayala, 59 Cal. 4th at 530.  Based on the evidence presented, the parties' arguments, the Court's assessment of the parties' overall relationship and its observation of the witnesses, the Court concludes that the factors applicable in making that determination convincingly establish that Plaintiffs were not employees.  That a few factors might suggest an employment relationship does not compel a different result where, as here, all the relevant factors weighed and considered as a whole establish that Plaintiffs were independent contractors.  See Arnold, 202 Cal. App. 4th at 590 ("Even if one or two of the individual factors might

suggest an employment relationship, summary judgment is nevertheless proper when, as here, all the factors weighed as a whole establish that Arnold was an independent contractor and not an employee for purposes of Labor Code sections 202 and 2802."). Plaintiffs were "operating independent businesses for their own accounts." Borello, 48 Cal. 3d at 345. Their claim under section 2802 therefore fails.

## F.    Remaining Claims

### 1.    Section 17200 Claim

The other two remaining claims in Plaintiffs' complaint in Case No. CV 17-7454 DSF (ASx)(Haitayan I), are state claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, which prohibits "any unlawful, unfair or fraudulent business act or practice." See dkt. 222 at 5-6, 15; dkt. 283 at 17. These claims are derivative of Plaintiffs' substantive claims. Dkt. 283 at 5. Because Plaintiffs' predicate section 2802 claim fails, their UCL claims fail as a matter of law. See Martinez v. Wells Fargo Home Mortg., Inc., 598 F.3d 549, 558 (9th Cir. 2010) (plaintiff cannot state a UCL claim if the predicate conduct relied upon is not actionable).

### 2.    Case No. CV 18-5465 DSF (ASx) Claims

In Case No. CV 18-5465 DSF (ASx) (Haitayan II), Plaintiffs seek a declaration that the releases they executed in conjunction with the renewal of their franchise agreements are unenforceable. Haitayan II, dkt. 48. Specifically, they seek a declaration "that the General Release contained within the 7-Eleven franchise renewal contract is invalid, unenforceable, and unconscionable, as it pertains to claims pending in" Haitayan I. Id. at 17. Because the Court has concluded that Plaintiffs' claims in Haitayan I fail, the underlying premise of Plaintiffs' challenges to the enforceability of the releases likewise fail. Their UCL claim also fails because there is no predicate violation.

### III. CONCLUSION

For the reasons stated above, the Court finds for 7-Eleven on all claims in Case Nos. CV 17-7454 DSF (ASx) and CV 18-5465 DSF (ASx). 7-Eleven's Counterclaim and Third-Party Complaint in Case No. CV 17-7454 DSF (ASx) are dismissed as moot.

7-Eleven is to submit proposed judgments no later than September 16, 2021.  Any objections to the proposed judgments must be submitted no later than September 29, 2021.

IT IS SO ORDERED.

Date: September 8, 2021

Dale S. Fischer
United States District Judge